**FIGUEIREDO FERRAZ CONSULTO-RIA E ENGENHARIA DE PRO-JETO LTDA., Plaintiff,**

v.

**The REPUBLIC OF PERU et al., Defendants.**

**No. 08 Civ. 492(WHP).**

United States District Court, S.D. New York.

Sept. 8, 2009.

Thomas Joseph Hall, Esq., Chadbourne & Parke LLP, New York, NY, for Plaintiff.

Juan C. Basombrio, Esq., Dorsey & Whitney LLP, Irvine, CA, for Defendants.

*MEMORANDUM & ORDER*

WILLIAM H. PAULEY III, District Judge:

Plaintiff Figueiredo Ferraz Consultoria E Engenharia de Projeto Ltda. ("Figueiredo") brings this action to confirm an arbitration award of $21,607,003 against the Republic of Peru (the "Republic"), the Ministerio de Vivienda, Construccion y Saneamiento (the Ministry of Housing, Construction and Sanitation of the Republic) (the "Ministry"), and the Programa Agua Para Todos ("PAPT"). PAPT is the successor to Programa de Apoyo a la Reforma Del Sector Saneamiento ("PARSSA"), which itself was formerly known as Proyecto Especial Programa Nacional de Agua

Potable y Alcantarillado ("PRONAP").[1] Figueiredo claims it is entitled to enforce the arbitration award pursuant to the Inter–American Convention on International Commercial Arbitration (the "Inter–American Convention"), under the Federal Arbitration Act, 9 U.S.C. § 301 *et seq.* ("FAA"), or alternatively, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").

Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6), and on the grounds that the Court should decline jurisdiction under the doctrine of *forum non conveniens,* or for reasons of international comity. For the following reasons, Defendants' motion is denied.

## BACKGROUND

### I. *The Agreement and Award*

Figueiredo is a Brazilian corporation. (Amended Complaint dated Jan. 22, 2009 ("Am. Compl.") ¶ 2). On November 12, 1997, Figueiredo entered into a consulting agreement with the Program (the "Agreement") for engineering studies on water and sewage services in Peru. (Am. Compl. ¶ 13, Ex. H: English translation of the Agreement.) The Agreement provides: "The parties agree to subject themselves to the competence of the Judges and Courts of the City of Lima or the Arbitration Proceedings, as applicable." (Am. Compl. Ex. H at 17.) Following a fee dispute, Figueiredo commenced arbitration in Peru pursuant to the Agreement. (Am. Compl. ¶ 19.) On January 20, 2005, a Peruvian arbitral tribunal rendered its award, directing the Program to pay Figueiredo $21,607,003 (the "Award"). (Am. Compl. ¶ 23.) On February 18, 2005, the Ministry filed an "appeal for nullity against [the Award]," in the Court of Appeals in and for Lima, First Civil Division (the "Peruvian Court") challenging the Award. (Am. Compl. ¶ 24, Ex. L: The Peruvian Court Decision at 8.) On October 5, 2005, the Peruvian Court dismissed that challenge. (Am. Compl. 24.) Under Peruvian law, the decision of the Peruvian Court is final and cannot be appealed. (Am. Compl. ¶ 24.)

To the present, the Ministry has paid $1,414,884 toward the Award—the statutory 3% cap of the Program's operating budget. (Declaration of Julio Cesar Alcantara Meza dated Apr. 23, 2009 ("Meza Decl.") ¶¶ 9–10, 15.) In correspondence with the Peruvian Minister of Economy and Finance, the Ministry concedes that the Award "established [its] obligation . . . to cancel considerable sums of money," and bestowed upon the Ministry of Economy and Finance "the full responsibility . . . for the final solution of the payment of [the Award]." (Am. Compl. Ex. F: Letter from the Ministry to Luis Carranza Ugarte, Minister of Economy and Finance, dated Aug. 14, 2007 at 11, 16.)

### II. *Defendants' Contacts With New York*

The Republic is in the process of issuing $5 billion in debt securities in the United States. (Declaration of Thomas J. Hall dated Apr. 23, 2009 ("Hall Decl.") ¶ 2.) On December 12, 2008, the Republic filed a Registration Statement with the Securities and Exchange Commission ("SEC") (the "December 2008 Registration Statement"). (Hall Decl. ¶ 2.) According to the December 2008 Registration Statement: the Republic will maintain a paying agent and registrar in New York until the notes issued are fully paid; the Republic will appoint a New York corporation as its agent for process and consents to jurisdiction in New York state and federal courts in con-

---

1. PAPT, PARSSA, and PRONAP are collec-  tively referred to as the "Program."

nection with the issuance; the debt securities will be governed by New York law; the Republic is represented by a New York law firm; the Republic's authorized United States representative is an individual in the Peruvian Consulate General in New York; and the debt securities will be issued in the form of global notes, to be held by a New York trust company. (Hall Decl. ¶¶ 2(a)-(f).)

On March 30, 2009, the Republic issued $1 billion of U.S. Dollar denominated Global Bonds. (Hall Decl. ¶ 3.) A March 25, 2009 Prospectus Supplement describes the Republic's contacts with New York, in virtually identical terms to those set out in the December 2008 Registration Statement. (Hall Decl. ¶¶ 3(a)-(f).)

In addition to the December 2008 Registration Statement, the Republic filed registration statements in December 2006, January 2005, November 2003, January 2003, and November 2002, in connection with the issuance of approximately $13 billion in other debt securities. (Hall Decl. ¶ 4.) Each of those registration statements described contacts with New York like those contacts set forth in the December 2008 Registration Statement. (Hall Decl. ¶¶ 4(a)-(f).) Finally, in September 2002, the Republic filed a Registration Statement concerning an exchange of "Global Bonds" for "Exchange Bonds" that enumerated similar details about the Republic's contacts with New York. (Hall Decl. ¶ 5.)

## DISCUSSION

### I.  Defendants' 12(b)(6) Motion

#### A.  Legal Standard

The Republic and the Ministry argue that this Court cannot confirm the Award against them because they were not signa-

tories to the Agreement. Figueiredo counters that the Ministry and the Program are political subdivisions of the Republic.

On a motion to dismiss, a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in plaintiff's favor. *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir.1998). Nonetheless, "factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (requiring plaintiff to plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [his claim]"). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, — U.S. —, —, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.Ct at 1949 (citation omitted). A court's "consideration [on a motion to dismiss] is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). In addition, under Federal Rule of Civil Procedure 44.1, this Court may make determinations regarding foreign law by considering "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

Fed.R.Civ.P. 44.1.[2]

### B. *The Legal Status of the Program*

In *Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Federation*, 361 F.3d 676, 677 (2d Cir.2004) ("*Noga* "). the Second Circuit held that an "arbitration award can be confirmed and enforced against a sovereign nation [even] where the arbitration agreement was signed by an organ of that nation's central government and where that organ—and not the nation itself—participated in the underlying arbitration proceedings." The Court of Appeals described the central inquiry as whether "the [signatory to the arbitration agreement was] an instrumentality established as a juridical entity distinct and independent from the [sovereign]," *Noga*, 361 F.3d at 685, or a political organ of the sovereign nation, *Noga*, 361 F.3d at 688.

Thus the question here is whether the Program is an instrumentality established as a juridical entity distinct and independent from the Republic, or whether it is a political organ of the Republic. *See Noga*, 361 F.3d at 685. If the Program is a political organ, then there is no meaningful legal distinction between it and the Republic for confirmation of the Award. *See Noga*, 361 F.3d at 688.

#### 1. *Peruvian Law*

Applying *Noga*, this Court turns first to Peruvian law to determine whether the Program and the Republic should be treated as separate parties for purposes of this action. *See Noga*, 361 F.3d at 685. Defendants offer the declaration of a Peruvian attorney and university professor, setting forth the relevant provisions of Peruvian law. Plaintiff offers its own foreign law expert declaration in opposition, which Defendants seek to preclude. Pursuant to Rule 44.1 this Court makes the following rulings as to Peruvian law. *See* Fed.R.Civ.P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.").

Under Article 119 of the Political Constitution of Peru, the direction and management of public services is assigned to the Council of Ministers, and each Ministry is charged with matters related to its competency. (Declaration of Jorge Avendano dated Mar. 24, 2009 ("Avendano Decl.") ¶ 14.) Programs and Special Projects may be created to further the specific functions of the Ministries, and are assigned either to a Ministry or a Political Body. (Avendano Decl. ¶ 15.) Under Law No. 29158 of the Executive Branch, the Program is a public entity. (Avendano Decl. ¶ 15.) Known as Executive Units, public entities are empowered to collect revenue, enter into contracts, issue and/or place debt obligations, and propose budgets for authorization by the Ministry of Economy and Finance. (Avendano Decl. ¶ 16.)

Since the 1990s, the Peruvian Government and the Interamerican Development Bank ("BID") have spearheaded a project to support basic sanitation and implement a national drinking water and sanitation program. (Avendano Decl. ¶ 18.) BID provided $140 million and the Republic contributed another $60 million to the project. (Avendano Decl. ¶ 18.)

By Ministerial Resolution, the Republic created the Program as an Executive Unit

---

**2.** Defendants gave proper notice under Rule 44.1 of their intent to raise issues of Peruvian law in support of their motion to dismiss.

to handle these tasks. (Avendano Decl. ¶ 19.) Broadly, the project's objectives are consolidation and refurbishment of sanitation infrastructure, and planned expansion and infrastructure improvements for future investment programs. (Avendano Decl. ¶ 18.) At different times the Program operated under the auspices of the Ministry of the Presidency and the Ministry of Housing, Construction and Sanitation. (Avendano Decl. ¶ 16.) The Program's rules of organization established the Program as an organ of the Ministry of the Presidency, attached to the Deputy Minister of Infrastructure, with technical and administrative independence. (Avendano Decl. ¶ 23.) The economic and financial resources of the Program consist of: (1) loan contracts; (2) allocations by the Annual Budget for the Public Sector Act and from the Public Treasury; (3) transfers or donations; and (4) assets available to the Executive Unit of the National Drinking Water and Sanitation Program at the time it was granted status as a Special Project. (Avendano Decl. ¶ 26.)

In 2007, a Supreme Decree created the current version of the Program, known as Agua para Todos (Water for All), to coordinate and manage various sanitation programs funded with public money. (Avendano Decl. ¶ 28.) By Ministerial Resolution, Agua para Todos was formed by a management body (the Executive Management), Advising Bodies(Legal Counsel Office and Planning Office), a Support Body (Administrative and Budget Management) and Program Bodies (Direction of Engineering, Technical Unit of the National Housing Fund, and the Management Unit of the National Rural Sanitation Program). (Avendano Decl. ¶ 31.)

Finally, judgments against a government entity must be satisfied from the budget of the governmental entity that generated the debt. (Avendano Decl. ¶ 64.) If the judgment exceeds the entity's budget, the entity's General Office of Administration shall so inform the appropriate judicial authority and is obligated to allocate up to 3% of its annual budget towards payment of the debt. (Avendano Decl. ¶ 64.)

Under Peruvian law, the Program is not a sovereign, corporation, or instrumentality separate from the Republic. Rather, it is a political organ of the Republic. It functions in a manner parallel to the entity in *Noga* which the Court of Appeals held "should be treated as the same party [as the Russian Federation] for the purpose of this confirmation proceeding." *See Noga*, 361 F.3d at 686. Indeed, that entity—referred to as the Russian Government—and the Program share many characteristics which *Noga* found determinative. *Cf. Noga*, 361 F.3d at 686 ("[T]he Government was performing a quintessential 'governmental' function: financing the purchase of massive quantities of basic necessities and infrastructure improvements to provide for the Russian people and paying for those necessities and improvements with the country's natural resources."). Applying that analysis, the Program and the Republic are not separate entities under Peruvian law.

### 2. *Federal Common Law*

▮ The conclusion that no meaningful legal distinction can be drawn between the Republic and the Program is further supported by principles of federal common law. Under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ("FSIA"), courts have drawn a distinction between an agency or instrumentality of a foreign state, which is treated as a separate legal person, and other organs or subdivisions of that state, which are treated as the state itself. *See Garb v. Republic of Poland*, 440 F.3d 579, 590 (2d Cir.

2006) (discussing distinction between agencies or instrumentalities of a foreign state and other organs or subdivisions of a foreign state). This distinction, as well as the test used to make this distinction—the "core functions test"—are also applicable to the confirmation and enforcement of foreign arbitral awards. *See Garb*, 440 F.3d at 592 (discussing *Noga*); *Noga*, 361 F.3d at 687. Under the core functions test, "a foreign entity's status as 'a separate legal person' from a foreign state depends on 'whether the core functions of the foreign entity are predominantly governmental or commercial.'" *Garb*, 440 F.3d at 591 (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C.Cir.1994)). The determination does not "rely[ ] mechanically on the legal status of the foreign entity, or giv[e] dispositive weight to whether the foreign entity [can] sue or be sued in its own name, contract in its own name, or hold property in its name. Rather, the issue is, what function does the entity perform?" *Aurelius Capital Partners, LP v. Republic of Argentina*, No. 07 Civ. 2715(TPG), 2009 WL 755231, at *10 (S.D.N.Y. Mar. 12, 2009) (internal citation omitted). Indeed, "the very purpose of the 'core functions' test is to look beyond mere labels to discern whether an entity is actually engaged in predominantly governmental activity or whether its primary functions are instead commercial." *Garb*, 440 F.3d at 597 n. 22.

It is clear that the Program performs a governmental rather than a commercial function. The Program is a public entity of the Executive Branch assigned throughout its existence to either the Ministry of the Presidency or the Ministry of Housing, Construction and Sanitation. As an Executive Unit, the Program is an organ of the Ministry of the Presidency, attached to the Deputy Minister of Infrastructure. It was created to implement a national drinking water and sanitation program throughout Peru and is responsible for the coordination and management of various programs related to Peru's sanitation infrastructure. The Program was funded initially by $60 million from the Republic and receives funding from the Public Treasury. Thus, it conducts quintessential governmental functions.

In *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (*"Bancec"*) the Supreme Court held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," thus giving rise to a presumption of separateness between the two. 462 U.S. at 627, 103 S.Ct. 2591; *accord Letelier v. Republic of Chile*, 748 F.2d 790, 794 (2d Cir.1984) (*Bancec* recognized the "presumption of separateness" that ought to be afforded a foreign state's instrumentality); *see also Noga*, 361 F.3d at 685–86 ("[G]iven the Supreme Court's *Bancec* decision, had either the Government or the Russian Federation wanted to shield the latter entity from being subject of these confirmation proceedings, either could have designated a publicly-owned state corporation or *instrumentality* as the entity to contract with Noga." (emphasis added)). According to Defendants, the Program is a separate legal entity with independent management and operational autonomy that can enter into contracts, incur debt, and make payments to satisfy the Award.

However, *Bancec* "is of little help" where the issue is *"whether* the . . . instrumentality [was] established as a juridical entity distinct and independent." *Noga*, 361 F.3d at 685; *see also Aurelius Capital Partners*, 2009 WL 755231, at *10 ("The issue in [*Bancec*] was whether a Cuban bank, which was an 'instrumentality' of the Cuban government, could be held respon-

sible for certain liabilities of the Cuban government.").

■ Even if the Program was entitled to a presumption of separateness, that presumption has been overcome. In correspondence with the Minister of Economy and Finance, the Ministry acknowledges that the Award is its obligation and that final payment is the Ministry of Economy and Finance's full responsibility. Moreover, the Ministry, not the Program, has paid Figueiredo. While Defendants argue that those payments were drawn from the Program's budget, it is clear that the Program's assets are not distinct from those of the Republic. The Program's finances are dominated by the Republic and its budgets are subject to authorization by the Ministry of Economy and Finance. *See Noga,* 361 F.3d at 688 ("the [political organ] owns no assets that could be attached to satisfy a judgment confirming the [arbitration award]"); *Aurelius,* 2009 WL 755231, at *11 (presumption of separateness overcome where the Argentine Government dominated the finances of an Argentine entity). Finally, it was the Ministry, not the Program, that challenged the Award in the Peruvian Court.

Therefore, the Program is the Republic's political organ and there is no meaningful legal distinction between them for confirmation of the Award. Defendants do not dispute that the Ministry is an organ of the Republic. *See Noga,* 361 F.3d at 687 ("Numerous other courts have assumed without discussion that governmental departments or ministries … qualify as political subdivisions of a foreign state

under the FSIA." (alteration in original) (internal quotation marks omitted)); *Garb,* 440 F.3d at 596 n. 21 ("[E]xisting case law hold[s] that departments or ministries of a central government qualify as 'political subdivisions of a foreign state' under FSIA."); *Bancec,* 462 U.S. at 618 n. 5, 103 S.Ct. 2591 ("the [Cuban] Ministry of Foreign Trade is no different than the Government [of Cuba] of which its minister is a member" (alterations in original) (internal quotation marks omitted)). Accordingly, Defendants' motion to dismiss for failure to state a claim against the Republic and the Ministry is denied.[3]

## II. *Foreign Sovereign Immunities Act*

"The FSIA provides for enforcement jurisdiction [in a United States court] over foreign states that have agreed to submit to arbitration their disputes with private parties where 'the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.'" *In the Matter of Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 311 F.3d 488, 494 (2d Cir.2002) ("*Monegasque*") (citing 28 U.S.C. § 1605(a)(6)(B)). "For the purposes of the FSIA, a foreign state includes an instrumentality or agency of a foreign state." *Monegasque,* 311 F.3d at 494 (citing § 1603(a)-(b)).

■ Defendants argue that since Figueiredo designated itself a Peruvian domiciliary for purposes of the arbitration,

---

**3.** In *Noga,* apart from analyzing the relationship between the Russian Government and Russian Federation under Russian law and federal common law, the Court of Appeals addressed principles of international law. The Court of Appeals concluded that "regardless of whether principles of Russian law, federal common law, or international law are

applied, the Russian Federation and the Government are not separate 'parties' for the purposes of confirming and enforcing an arbitral award under the Convention." *Noga,* 361 F.3d at 690. In view of that holding, and the fact that the parties here have not fully briefed principles of international law, the Court declines to embark on such an analysis.

this Court lacks subject matter jurisdiction under the FSIA. Since the parties agree that the Inter–American Convention governs this action, Defendants assert that enforcement of awards between nationals of the same nation is not permitted.

This Court is unaware of any legal basis for declining jurisdiction pursuant to the Inter–American Convention where an arbitration arises from a commercial relationship between citizens of signatory nations—here Brazil and Peru—that share a domicile. Rather, "[a]rbitral decisions or awards made in the territory of a foreign State shall, on the basis of reciprocity, be recognized and enforced under this chapter ... if that State has ratified or acceded to the Inter–American Convention." 9 U.S.C. § 304. "A plain reading of § 304 ... indicates that [it is only] intended to bar the enforcement of arbitration decisions rendered in nations that are not signatories to the Inter–American Convention." *Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.,* 23 F.3d 41, 44 (2d Cir.1994).

The Inter–American Convention makes no reference to "domicile." Instead, it speaks in terms of "citizenship." *See* 9 U.S.C. § 305(1) ("If a majority of the parties to the arbitration agreement are *citizens* of a State or States that have ratified or acceded to the Inter–American Convention and are member States of the Organization of American States, the Inter–American Convention shall apply." (emphasis added)). For purposes of the FSIA, a foreign corporation's citizenship must be determined in accordance with 28 U.S.C. § 1332(c), which provides that "a corporation shall be deemed a citizen of any State by which it has been incorporat-

ed and of the State where it has its principal place of business. . . ." *Bailey v. Grand Trunk Lines New England,* 805 F.2d 1097, 1100 (2d Cir.1986). Figueiredo is incorporated in Brazil and does not have its principal place of business in Peru. Since Figueiredo is not a Peruvian citizen, the Court need not address Defendants' argument that the FSIA cannot be applied to arbitrations between a foreign sovereign and one of its nationals. Accordingly, Defendants' motion to dismiss for lack of subject matter jurisdiction under the FSIA is denied.[4]

III. *Personal Jurisdiction*

A. *Rule 12(b)(2) Standard*

Figueiredo bears the burden of establishing personal jurisdiction over the Republic. *See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir.1993). Prior to discovery, a plaintiff may defeat a Rule 12(b)(2) motion to dismiss by pleading a prima facie showing of personal jurisdiction. *In re Magnetic Audiotape Antitrust Litigation,* 334 F.3d 204, 206 (2d Cir.2003). All pleadings and affidavits are construed in plaintiff's favor. *PDK Labs v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997).

B. *Statutory Personal Jurisdiction*

Under 28 U.S.C. § 1330(b), a district court has personal jurisdiction whenever subject matter jurisdiction exists under 28 U.S.C. § 1330(a) and service of process has been made under 28 U.S.C. § 1608. Section 1330(a) provides for subject matter jurisdiction whenever a foreign state is not entitled to immunity either under the substantive provisions of the FSIA, or under

---

**4.** Defendants also argue that the arbitration exception to the FSIA does not apply to the Ministry or the Republic because they are not signatories to the Agreement. Because the

Program is the Republic's political organ and there is no meaningful legal distinction between it and the Republic, the argument is without merit.

any applicable international agreement. 28 U.S.C. § 1330(a). Therefore, the FSIA "makes the statutory aspect of personal jurisdiction simple: subject matter jurisdiction plus service of process equals personal jurisdiction." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 308 (2d Cir.1981). As described above, this Court has subject matter jurisdiction under the FSIA, and the parties do not dispute that Figueiredo properly effected service on the Republic. Accordingly, the statutory requirements for personal jurisdiction under the FSIA are met.

#### C. *Due Process*

■ "[T]he exercise of personal jurisdiction under the FSIA must also comport with the Due Process Clause, which permits a forum to exercise personal jurisdiction over a non resident defendant who has certain minimum contacts [with the forum] ... such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,* 241 F.3d 135, 152 (2d Cir.2001) (second alteration in original) (internal citations and quotation marks omitted).[5] "The 'minimum contacts' test essentially involves four separate inquiries: (1) the extent to which defendants availed themselves of the privileges of American law; (2) the extent to which litigation in the United States would be foreseeable; (3) the inconvenience to defendants litigating in the United States; and (4) the countervailing interest in hearing the suit." *WMW Machinery, Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau,* 960

F.Supp. 734, 743 (S.D.N.Y.1997) (citing *Texas Trading,* 647 F.2d at 314).

■ To determine whether jurisdiction exists, "a court examines the defendant's ... contacts [with the forum] to determine if they are sufficient to support a holding that those contacts constitute 'continuous and systematic' presence ...." *Frontera,* 479 F.Supp.2d at 386. Such a finding "requires that the defendant's contacts approximate physical presence." *Frontera,* 479 F.Supp.2d at 386. If a court determines there are adequate minimum contacts with the United States, it must go on to determine "whether it is reasonable under the circumstances of the particular case" to exercise jurisdiction. *Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 568 (2d Cir.1996).

Since 2002, the Republic has filed six registration statements with the SEC, allowing it to issue more than $13 billion in debt securities in New York. Pursuant to those registration statements, the Republic maintains a paying agent and a registrar in New York City, and a New York corporation as agent for process; the securities were issued in the form of global notes held and exchanged by a New York trust company; the Republic's authorized United States representative is an individual located at the Peruvian Consulate General in New York City; and the Republic's payments of these notes have been made and are required to be made directly to a New York corporation.

Taking these contacts into consideration, "[i]t is apparent that defendant regularly and significantly availed itself of the privileges of United States banking and finan-

---

**5.** While the Second Circuit questioned in dicta whether the Due Process Clause applies to foreign states, *see Hanil Bank v. PT. Bank Negara Indon. (Persero),* 148 F.3d 127, 134 (2d Cir.1998), this Court declines Plaintiff's invitation to hold that it does not, and follows

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir.1981). That holding harmonizes with other rulings in this district. *See, e.g., Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan,* 479 F.Supp.2d 376, 385 (S.D.N.Y.2007).

cial laws." *Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos,* 712 F.Supp. 383, 391 (S.D.N.Y.1989). The Republic's issuance of debt securities is precisely the type of activity sufficient to establish "minimum contacts." *See Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 619–20, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) ("By issuing negotiable debt instruments denominated in United States dollars and payable in New York and by appointing a financial agent in that city, Argentina 'purposefully avail[ed] itself of the privilege of conducting activities within the [United States].'" (alterations in original)). In *Weltover* the Supreme Court assumed, without deciding, that a foreign state is a "person" for purposes of the Due Process Clause. *Weltover,* 504 U.S. at 619, 112 S.Ct. 2160. While the Supreme Court noted "[w]hether there is a constitutional basis for personal jurisdiction over [Argentina] is not before the Court as an independent question," *Weltover,* 504 U.S. at 620 n. 2, 112 S.Ct. 2160 (alterations in original), it found "that Argentina possessed 'minimum contacts' that would satisfy the constitutional test," *Weltover,* 504 U.S. at 619, 112 S.Ct. 2160. Therefore, the Supreme Court directly addressed the types of contacts at issue here, and held them to be sufficient for the purposes of a minimum contacts analysis. "Congress enacted FSIA specifically to provide access to the courts." *Hanil Bank,* 148 F.3d at 134. Having issued $13 billion in debt securities in New York, Defendants could reasonably anticipate being sued in New York.

Relying on cases discussing the relationship between a parent and its wholly owned subsidiary, Defendants argue that due process requires this Court to assess separately whether personal jurisdiction exists as to the Ministry and the Program. However, such an analysis contradicts this Court's holding that neither the Program nor the Ministry has a legal existence sep-

arate from the Republic. Indeed, "analogizing the relationship between the [foreign sovereign] and [its political organ] to the relationship between a corporate parent and a subsidiary belies the reality of the political relationship between [the two] and is thus inapposite." *Noga,* 361 F.3d at 687. Therefore, this Court need not engage in a separate analysis with respect to the Ministry or the Program. Accordingly, Defendants' motion to dismiss for lack of personal jurisdiction is denied.

## IV. *Forum Non Conveniens*

■ "A federal court has discretion to dismiss a case on the ground of *forum non conveniens* when an alternative forum has jurisdiction to hear [the] case, and ... trial in the chosen forum would establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience, or ... the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 429, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007) (quoting *Am.Dredging Co. v. Miller,* 510 U.S. 443, 447–48, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) (alterations in original)). This Court has broad discretion in applying *forum non conveniens. Norex Petroleum Ltd. v. Access Indus., Inc.,* 416 F.3d 146, 153 (2d Cir.2005). In exercising this discretion, courts consider: (1) the degree of deference afforded to plaintiff's choice of forum; (2) whether the alternative forum is adequate; and (3) the balance of the public and private interests implicated in the choice of forum. *Norex Petroleum,* 416 F.3d at 153. "Although the [Inter–American] Convention establishes jurisdiction in the United States as a signatory state through a venue statute appended to the [FAA], there remains the authority to reject that jurisdiction for rea-

sons of convenience, judicial economy and justice." *Monegasque*, 311 F.3d at 497 (internal citation omitted).

### A. Deference to Figueiredo's Choice of Forum

"A domestic petitioner's choice of its home forum receives great deference, while a foreign petitioner's choice of a United States forum receives less deference." *Monegasque*, 311 F.3d at 498. However, deference is measured on a "sliding scale." *Monegasque*, 311 F.3d at 498. "The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice. Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*." *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71–72 (2d Cir.2001) (en banc). "[T]he more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons—such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum—the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts." *Iragorri*, 274 F.3d at 72. Where the Inter–American Convention is the parties' only link to the United States and great inconvenience would inhere in litigating complex issues, little deference is given to a petitioner's choice of forum. *See Monegasque*, 311 F.3d at 499.

As a foreign plaintiff, Figueiredo's choice of a United States forum receives less deference, but given the Republic's substantial assets here, that choice is entitled to some weight. As this Court noted in exercising personal jurisdiction over Defendants, Congress enacted the FSIA specifically to provide access to the United States' courts, *see Hanil Bank*, 148 F.3d at 134, and the Republic purposefully availed itself of the privilege of conducting business within the United States. Therefore, having determined that both subject matter and personal jurisdiction exists over Defendants, the Inter–American Convention does not provide the only link between Defendants and the United States. *Contra Monegasque*, 311 F.3d at 499. Moreover, there is no indication that Figueiredo's choice of forum was motivated by forum-shopping considerations, especially given that "an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (internal quotation marks omitted). Accordingly, this Court affords deference to Figueiredo's choice of forum.

### B. Adequacy of the Alternative Forum

"An alternative forum is ordinarily adequate if the defendants are amenable to service of process there and the forum permits litigation of the subject matter of the dispute." *Monegasque*, 311 F.3d at 499. While Peruvian law allows for execution of arbitral awards, only a United States court "may attach the commercial property of a foreign nation locat-

ed in the United States." *TMR Energy Ltd. v. State Property Fund of Ukraine,* 411 F.3d 296, 303 (D.C.Cir.2005) (a foreign state is immune from attachment except when it has property in the United States used for commercial activity in the United States and such property may be attached "based on an order confirming an arbitral award rendered against the foreign state"); *see also* 28 U.S.C. §§ 1609, 1610(a)(6). Because there is no other forum in which Figueiredo could reach the Republic's assets in the United States, the Peruvian courts do not provide an adequate alternative forum.

### C. *Public and Private Interest Factors*

"A district court is constrained to balance two sets of factors in determining whether there should be an adjudication in a plaintiff's chosen forum or in the alternative forum suggested by the respondent." *Monegasque,* 311 F.3d at 500 (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). The private interest factors pertain to. *inter alia,* the convenience of the litigants, the relative ease of access to sources of proof, and the availability of compulsory process for attendance of unwilling witnesses. *Monegasque,* 311 F.3d at 500. "[T]he court should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues." *Iragorri,* 274 F.3d at 74. The public interest factors "include the administrative difficulties associated with court congestion; the imposition of jury duty upon those whose community bears no relationship to the litigation; the local interest in resolving local disputes; and the problems implicated in the application of foreign law." *Monegasque,* 311 F.3d at 500 (citing *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839); *Tel. Sys. Intern., Inc. v. Net-*work *Telecom PLC,* 303 F.Supp.2d 377, 384 (S.D.N.Y.2003).

■ The private interest factors do not weigh in favor of *forum non conveniens* dismissal in a summary proceeding such as this. *See Monegasque,* 311 F.3d at 500. Defendants argue that unlike a typical summary confirmation proceeding, confirmation of the Award will involve complex questions of Peruvian law and extensive discovery. At the same time, Defendants submitted numerous declarations in support of their argument that the Program is a separate juridical entity from the Republic. Therefore, as Defendants concede, whether the Award can be confirmed against the Republic is a question that can be, and has been, decided by this Court without extensive discovery. Indeed, in *Noga,* the Court of Appeals relied on these same types of documents in determining that the Russian Federation and the Russian Government were not separate "parties" for purposes of confirming and enforcing an arbitral award. *See Noga,* 361 F.3d at 685 (turning to the Russian Constitution to determine "whether the Government and the Russian Federation should be treated as separate parties for the purposes of this confirmation proceeding"). Accordingly, the private interest factors weigh against *forum non conveniens* dismissal.

■ For similar reasons, public interest factors also militate against dismissal. American courts have an interest in enforcing commercial arbitration agreements in international contracts. *See Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). In addition, unlike *Monegasque,* this is not an action in which there is "simply ... no connection with the United States other than the fact that the United States is a Convention signatory." *Monegasque,* 311

F.3d at 500. The Republic has assets in this forum and the purpose of this proceeding is to collect on a debt. As the Supreme Court has explained:

> The primary rationale for treating the presence of property as a sufficient basis for jurisdiction to adjudicate the claims over which the [court] would not have jurisdiction if *International Shoe* applied is that a wrongdoer should not be able to avoid payment of his obligations by the expedient of removing his assets to a place where he is not subject to an in personam suit.

*R.F. Shaffer v. Heitner,* 433 U.S. 186, 210, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (internal quotation marks omitted). Similarly, the Republic should not be able to avoid payment of its obligations under the doctrine of *forum non conveniens* where it has entered into the Inter–American Convention and maintains assets in the United States. Therefore, the public interest factors weigh against dismissal. Accordingly, this Court denies Defendants' motion to dismiss for *forum non conveniens* grounds.

## V. *Forum Selection Clause*

■■■■ To dismiss an action based on a forum selection clause, the party seeking to enforce the clause must demonstrate, *inter alia,* that "the claims and parties involved in the suit are subject to the forum selection clause." *Altvater Gessler–J.A. Baczewski Intern. (USA) Inc. v. Sobieski Destylarnia S.A.,* 572 F.3d 86, 89 (2d Cir.2009). "However important a forum selection clause is to the efficient functioning of international business, it is a creature of contract." *Phillips v. Audio Active Ltd.,* 494 F.3d 378, 384 (2d Cir.2007) (internal citation omitted). Therefore, "a plaintiff's choice of forum 'will not be disregarded unless the contract evinces agreement by the parties that his claims cannot be heard there.' " *Altvater Gessler,*

572 F.3d at 90 (quoting *Phillips,* 494 F.3d at 387). "The court must examine the substance of [a plaintiff's] claims as they relate to the precise language of the specific clause at issue." *Altvater Gessler,* 572 F.3d at 90 (alterations in original) (internal quotation marks omitted).

■■■■ Defendants argue that the parties agreed to judicial recourse exclusively in Peru. However, the Agreement subjects the parties "to the competence of the Judges and Courts of the City of Lima or the Arbitration Proceedings, *as applicable.*" Thus, nothing in the Agreement precludes Figueiredo from invoking the Inter–American Convention and bringing an action to enforce the Award in the United States. *See Andros Compania Maritima, S.A. v. Andre & Cie., S.A.,* 430 F.Supp. 88, 94–95 (S.D.N.Y.1977) ("[I]n the presence of an agreement to arbitrate abroad, the path to this forum may be ... paved by the need to enforce that right and/or to preserv(e) the subject matter or assets intact within the jurisdiction, thus making (the subsequent arbitral) award meaningful."). Undoubtedly, the parties were aware that the Republic is a signatory to the Inter–American Convention and they could have drafted language preventing recourse to courts outside the Republic. Because the Agreement does not preclude Figueiredo's claim to enforce the Award in this forum, the forum-selection clause does not require dismissal of this action.

## VI. *Comity and Abstention*

Finally, Defendants argue that this action should be dismissed on grounds of international comity and abstention. However, Defendants offer no legal authority for the proposition that a court with both subject matter and personal jurisdiction over the defendants in an action seeking to enforce an arbitral award pursuant to the

FAA should dismiss the action as a means of furthering international comity. In the absence of such authority, this Court declines to do so. Accordingly, Defendants' motion to dismiss based on grounds of international comity and abstention is denied.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is denied. While Figueiredo's pleading is styled as an Amended Complaint, the Federal Arbitration Act requires that it be treated as a motion to confirm. *D.H. Blair*, 462 F.3d at 108–109; *Productos Mercantiles E Industriales*, 23 F.3d at 46. Because the parties' submissions do not address the relevant legal standard for confirmation of an arbitration award, this Court does not reach the ultimate question whether the Award should be confirmed.

SO ORDERED.