09-3925-cv
Figueiredo Ferraz v. Republic of Peru

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2010

Heard: October 19, 2010          Decided: December 14, 2011
Last papers submitted: June 22, 2011

Docket Nos. 09-3925-cv (L), 10-1612-cv (CON)

- - - - - - - - - - - - - - - - - - - - - - - - - - - -
FIGUEIREDO FERRAZ E ENGENHARIA DE PROJETO LTDA.,
        Plaintiff-Appellee,

                        v.

THE REPUBLIC OF PERU, MINISTERIO DE VIVIENDA,
CONSTRUCCION Y SANEAMIENTO, PROGRAMA AGUA PARA
TODOS (PAPT) (successor by integration to
Programa De Apoyo A La Reforma Del Sector
Saneamiento (PARSSA), formerly known as Proyecto
Especial Programa Nacional De Agua Potable &
Alcantarillado (PRONAP)),
        Defendants-Appellants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, WINTER and LYNCH, Circuit Judges.

        Interlocutory appeal from the September 8, 2009, order of the United States District Court for the Southern District of New York (William H. Pauley III, District Judge), denying a motion to dismiss a suit seeking confirmation of an international arbitration award.

        The Appellant contends that the petition should be dismissed on the ground of *forum non conveniens* in favor of an action in the courts of Peru.

        Reversed and remanded with directions to dismiss the petition. Judge Lynch dissents with a separate opinion.

Juan C. Basombrio, New York, N.Y. (Mark S. Sullivan, Dorsey & Whitney LLP, New York, N.Y., on the brief), for Defendants-Appellants.

Thomas J. Hall, New York, N.Y. (Robert E. Grossman, Paige M. Willan, Chadbourne & Parke LLP, New York, N.Y., on the brief), for Appellee.

JON O. NEWMAN, Circuit Judge.

This is an interlocutory appeal from the denial of a motion to dismiss, primarily on the ground of *forum non conveniens* ("FNC"), a petition seeking confirmation of an international arbitration award. A principal public interest factor to be weighed in assessing the FNC claim is a Peruvian statute that limits the amount of money that an agency of the Peruvian government may pay annually to satisfy a judgment. The limit is three percent of the agency's annual budget.[1] The Republic of Peru ("the Republic"), the Ministry of Housing, Construction and Sanitation ("the Ministry"), and the Programa Agua Para Todos ("the Program") – collectively "the Appellants" – appeal from the September 8, 2009, order of the United States District Court for the Southern District of New York (William H. Pauley III, District Judge), denying their motion to dismiss an action to confirm an arbitration award in favor of Appellee Figueiredo Ferraz Consultoria E Engenharia de Projeto Ltda. ("Figueiredo"). *See Figueiredo Ferraz*

---

[1]Throughout the litigation, the parties have referred to the three percent provision as a "cap." In recent correspondence to this Court, the Plaintiff-Appellee refers to it as "a maximum that an agency is required to set aside from its budget each year to pay awards and judgments." Letter from Thomas J. Hall, Esq. to Catherine O'Hagan Wolfe, Clerk of Court (June 16, 2011) (original citation and textual alteration omitted). We will continue to refer to the provision as a "cap" or a "limit" without intending thereby to interpret its precise meaning.

*Consultoria E Engenharia de Projeto Ltda. v. Republic of Peru*, 655 F. Supp. 2d 361 (S.D.N.Y. 2009). The Appellants sought dismissal on several grounds, including lack of subject matter jurisdiction, FNC, and international comity. We conclude that the District Court erred in declining to dismiss on the FNC ground and therefore reverse and remand with directions to dismiss the petition.

Background

This case arises from a consulting agreement entered into by the Appellee and the Program in 1997, pursuant to which the Appellee was to prepare engineering studies on water and sewage services in Peru. The agreement provides: "The parties agree to subject themselves to the competence of the Judges and Courts of the City of Lima or the Arbitration Proceedings, as applicable." After a fee dispute arose, the Appellee commenced arbitration in Peru against the Program, and in January 2005, the arbitral tribunal rendered an award (the "Award") directing the Program to pay the Appellee more than $21 million, which included approximately $5 million of principal damages plus accrued interest and cost of living adjustments as of the time of the award. The Ministry appealed to the Court of Appeals in Lima, challenging the Award and seeking its nullification on the ground that, under Peruvian law, the arbitration was an "international arbitration" involving a non-domestic party and, thus, recovery should have been limited to the amount of the contract. In October 2005, the Lima Court of Appeals denied the appeal, ruling that because the Appellee had designated itself a Peruvian domiciliary in the agreement and the arbitration, the arbitration was a "national arbitration" involving only domestic

–3–

parties, and thus, the Award, rendered in equity, was permissible.  In its pending amended petition[2] in the Southern District of New York, the Appellee alleges that it is a Brazilian corporation.

A Peruvian statute imposes, in some circumstances, a limit of three percent of the budget of a governmental entity on the amount of money the entity may pay annually to satisfy a judgment.[3]  *See* Law No. 27584, Art. 42, *as amended by* Law No. 27684, *currently set forth in* Supreme Decree No. 013–2008–JUS, Art. 47.[4]

---

[2]The Appellee has styled its amended petition to confirm and enforce the Award as an amended "complaint."  As the District Court correctly noted, *see Figueiredo*, 655 F. Supp. 2d at 378, the Appellee's pleading is more properly termed a "petition" or "motion." *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 101, 107 (2d Cir. 2006).  We will refer to the Appellee's pleading as a "petition."

[3]Because the precise meaning of the statute is unclear and need not be definitively explicated in this lawsuit, we will not endeavor to state the operation of the statute with precision.

[4]An English language explanation of the statute was provided by Jorge Avendaño, a Peruvian lawyer and law professor. As explained by Prof. Avendaño, the statute establishes the following procedure:

"(i)     Requirements to pay ordered by judges shall be attended only and exclusively by the budget division in which the debt was generated, under the responsibility of the head of the division.

"(ii)    The General Office of Administration of the corresponding state entity or agency must proceed in conformity with the general mandate of the requirement and within the framework of the annual budget laws.

"(iii)   In case the financing ordered by the General Office of Administration is insufficient for compliance with the sentence, the head of the division may make budget modifications within fifteen days of receiving the notification, which fact must be communicated to the corresponding jurisdictional agency.

"(iv)    Should there be requirements in excess of the

-4-

Although the Appellee has not attempted to confirm the arbitration award in a Peruvian court or obtain and execute upon a judgment in Peru, the Program has been making payments on the Award. However, because of imposition of the statutory three percent cap, the Program's payment at the time of briefing was just over $1.4 million.

In January 2008, the Appellee filed a petition in the Southern District to confirm the Award and obtain a judgment for $21,607,003. The petition was brought pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. ("FAA"), the Inter-American Convention on

financing possibilities expressed above, the General Office of Administration of the corresponding sector shall inform the judicial authority of its commitment to attend to such sentences in the following budgetary exercise, to which end it is obliged to destine [*sic*] up to 3% of the budgetary allotment assigned to the division by the source of ordinary resources.

The Ministry of Economy and Finances and/or the Office of Provisional Normalization, as the case may be, shall calculate the 3% referred to above, deducting the amount corresponding to the allotment for the payment of service to the public debt, the contingency reserve and the provisional obligations.

"(v) When six months have lapsed since the judicial notification without the payment having been initiated or the obligation assumed in accordance with some of the procedures mentioned above, the process of execution of judicial resolutions provided for in Articles 713 *et seq*. of the Civil Procedures Code, which applies to individuals who must pay sums of money by judicial mandate, may be initiated. It is at this stage that the seizure of State goods may be requested, but only of the goods of private domain, since goods of public domain enjoy the immunity granted by Article 73 of the Political Constitution of Peru.

–5–

International Commercial Arbitration (the "Panama Convention"), enforceable pursuant to the FAA, *see id.* § 301, or, alternatively, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), also enforceable pursuant to the FAA, *see id.* § 201. Jurisdiction was based on the FAA, 9 U.S.C. § 203, and the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330(b). In opposing a motion by the Appellants to dismiss, the Appellee alleged that Peru has substantial assets in New York, resulting from the sale of bonds. The Appellants acknowledge the existence of these funds. In September 2009, the District Court denied the Appellants' motion to dismiss, which had asserted various grounds, including lack of subject matter jurisdiction under the FSIA, FNC, and international comity. The District Court ruled, among other things, that the Program and the Republic are not separate entities under Peruvian Law, *see Figueiredo*, 655 F. Supp. 2d at 369, that Peru is therefore subject to the Award despite not having signed the consulting agreement, *see id.* at 367-71, that jurisdiction was proper under the FSIA, *see id.* at 371-72, and that dismissal was not appropriate under FNC, *see id.* at 374-77, the Agreement's forum selection clause, *see id.* at 377, or international comity, *see id.* at 377-78. The Court appears not to have explicitly considered whether the three percent cap statute was relevant to any of the threshold issues it decided, and had no occasion to consider what effect, if any, that statute might have on the Appellants' payment obligation because the Court did "not reach the ultimate question whether the Award should be confirmed." *Id.* at 378.

The Appellants filed an interlocutory appeal, No. 09-3925, from the denial of their motion to dismiss, predicating appellate jurisdiction on the collateral order doctrine, which is applicable to an order denying a motion to dismiss that had sought FSIA immunity, *see Kensington International Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007).[5]  Thereafter, pursuant to 28 U.S.C. § 1292(b), the Appellants moved for leave to appeal the Court's determinations concerning FNC, the forum selection clause, and comity.  The Court granted the motion and certified for interlocutory appeal those portions of its ruling concerning these issues.  This Court then granted the Appellants' section 1292(b) petition for an interlocutory appeal,[6] No. 10-478-cv, and consolidated Nos. 09-3925-cv and 10-478-cv. *See Figueiredo v. Republic of Peru*, No. 10-478 (2d Cir. Apr. 29, 2010) (order granting interlocutory appeal).  After oral argument, we invited the views of the United States on "aspects of the appeal that might have implications for the conduct of the foreign relations of the United States."[7] *See* Letter from Catherine O'Hagan Wolfe, Clerk of Court, to

---

[5]*But cf. Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988), ruling that denial of a motion to dismiss on FNC grounds is not appealable as a collateral order.

[6]The order stated that the petition is granted "in the interests of judicial economy so as to allow the panel which will consider the merits of the FSIA appeal, Docket No. 09-3935-cv, an opportunity, if it wants to do so, to consider the questions presented in this appeal relating to forum."  We construe the order as authorizing this panel to consider all of the issues certified for interlocutory appeal by the District Court and all matters pertinent to those issues.

[7]We specifically called the Government's attention to the competing concerns that dismissal on *forum non conveniens* or other grounds might run counter to United States treaty obligations and that the three percent cap statute might either be a public factor warranting dismissal on the grounds of *forum non conveniens* or

-7-

Neal Katyal, Acting Solicitor General (Oct. 29, 2010). The *amicus curiae* brief submitted for the United States primarily urges a remand so that the District Court can give further consideration to the issue of subject matter jurisdiction over the Republic and the Ministry. *See* Brief for the United States at 6-20. The brief contended that the District Court did not err in declining to dismiss on grounds of either FNC, *see id.* at 21-27, or international comity, *see id.* at 27-29. The parties have also submitted briefs commenting on the views of the United States and letters responding to this Court's inquiry as to whether the three percent cap applies to funds of the Republic in the United States. The Appellee contends that the cap statute does not apply, *see* Letter from Atty. Thomas J. Hall to Catherine O'Hagan Wolfe, Clerk (June 16, 2011), a contention that the Appellants do not dispute, *see* Letter from Atty. Juan C. Basombrio to Catherine O'Hagan Wolfe, Clerk (June 15, 2011).

## Discussion

Although courts are normally obliged to consider issues of subject matter jurisdiction prior to other issues, the Supreme Court has approved the practice of this Court, *see In re Arbitration Between Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine*, 311 F.3d 488, 497-98 (2d Cir. 2002); *In re Minister Papandreou*, 139 F.3d 247, 255-56 (D.C. Cir. 1998), of exercising discretion to consider an FNC dismissal without first adjudicating issues of subject matter jurisdiction. *See Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422, 429-34 (2007). We have concluded that

international comity.

it is appropriate to do so in this case.

We review a district court's rejection of an FNC claim for abuse of discretion, but may reverse if we conclude that the court has made an error of law. *Moneagasque*, 311 F.3d at 498.

The FNC standards concern both private and public interests. *See American Dredging Co. v. Miller*, 510 U.S. 443, 448 (1994); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509-09 (1947); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998). Among the public interests are "a local interest in having localized controversies decided at home," *Gilbert*, 330 U.S. at 509, and the interest in having foreign law interpreted by a foreign court, *see PT United Can*, 138 F.3d at 74.

In the pending case, the District Court recognized that although the Panama Convention establishes jurisdiction in the United States, "'there remains the authority to reject that jurisdiction for reasons of convenience, judicial economy and justice.'" *Figueiredo*, 655 F. Supp. 2d at 374-75 (quoting *Monegasque*, 311 F.3d at 497). The Court then appropriately gave somewhat reduced deference to the foreign plaintiff's choice of forum, *id.* at 375 (citing *Monegasque*, 311 F.3d at 498), and considered several private and public interest factors, *see id.* at 376-77.

In considering the factor of the adequacy of an alternative forum, the District Court concluded that although Peruvian law permits execution of arbitral awards, "only a United States court 'may attach the commercial property of a foreign nation located in the United States,'" *id*. at 375-76 (quoting *TMR Energy Ltd. v. State Property*

*Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005)). In deeming a Peruvian forum inadequate for the stated reason, we think the District Court erred. It is no doubt true that only a United States court may attach a defendant's particular assets located here, but that circumstance cannot render a foreign forum inadequate. If it could, every suit having the ultimate objective of executing upon assets located in this country could never be dismissed because of FNC. Yet in *Monegasque*, to cite a recent example, we upheld an FNC dismissal in favor of suit abroad even though the plaintiff had obviously sought a judgment in the United States in order to execute upon a foreign government's assets here.[8]

---

[8]The Appellees contend that in *Monegasque* the debtor had no assets in the United States. This assertion might be based on our observation that "[t]he case before us simply has no connection with the United States other than the fact that the United States is a Convention signatory." *Monegasque*, 311 F.3d at 500. That statement might be understood to refer to the dispute between the parties, which originally concerned a contract between a Russian company, AO Gazprom, and a Ukrainian company, AO Ukragazprom, and ultimately between Nak Naftogaz of Ukraine ("Naftogaz"), which assumed the rights and obligations of Ukragazprom; Monde Re, a reinsurer of Gazprom; and Ukraine. *See id.* at 491–92. Similar to the pending case, Monde Re contended that Naftogaz was an "agent, instrumentality or alter ego of Ukraine." *Id.* at 492. Concerning assets in the United States, the District Court in *Monegasque* stated that although "it is not clear that Naftogaz has any assets in the United States[,] . . . [t]here is no evidence before the Court [] to suggest that the arbitral award – if confirmed here – would be easier to enforce against Ukraine in the United States rather than in the Ukraine." *Monegasque*, 158 F. Supp. 2d at 386–87. The first clause leaves it uncertain whether Naftogaz had any assets in the United States, but the second clause makes sense only if Ukraine had some assets in both the United States and Ukraine. The law review article that the Appellees cite for the proposition that our decision in *Monegasque* "note[d] an absence of identifiable property within [the United States]," William W. Park, "The Specificity of International Arbitration: The Case for FAA Reform," 36 Vand. J. Transnat'l L. 1241, 1264 (2003), Brief for Appellees at 59, misstated our position and did so by relying only on the District Court's statement in *Monegasque* concerning property of Naftogaz, omitting that Court's more pertinent statement concerning enforcement

-10-

"An alternate forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Molding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.11 (1981)).  Where adequacy of an alternative forum is assessed in the context of a suit to obtain a judgement and ultimately execution on a defendant's assets, the adequacy of the alternate forum depends on whether there are some assets of the defendant in the alternate forum, not whether the precise asset located here can be executed upon there.  *See Norex Petroleum Ltd. v. Access Industries, Inc.*, 416 F.3d 146, 158 (2d Cir. 2005) (adequacy of alternate foreign forum does not depend on "identical remedies").  And the fact that a plaintiff might recover less in an alternate forum does not render that forum inadequate.  *See Alcoa Steamship Co. v. M/V Nordic Regent*, 654 F.2d 147, 159 (2d Cir. 1980) (alternate forum not inadequate although plaintiff might recover only $570,000 there, rather than $8 million in the United States).  To the extent that the District of Columbia Circuit in *TMR Energy* considered a foreign forum inadequate because the foreign defendant's precise asset in this country can be attached only here, we respectfully disagree.[9]

_____

against Ukraine of an award in the United States.  *See* Park, *supra*, at 1264 n.99.

[9]We note that the District of Columbia Circuit relied on a footnote in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22, and its own prior decision in *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996).  *See TMR Energy*, 411 F.3d at 303.  *Piper Aircraft* made the unexceptional observation that an alternative forum would be inadequate if the remedy available there "is no remedy at all," 454 U.S. at 254.  Footnote 22 provided examples where the alternative forum "does not permit litigation of the subject matter of

-11-

The parties recognize that public interest factors are to be considered in determining whether an FNC dismissal is appropriate. *See Gilbert*, 330 U.S. at 508–09; *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 73–74 (2d Cir. 2001). The Appellants contend that the cap statute is a relevant, perhaps decisive, public factor to be weighed in the discretionary FNC decision. **[Blue 53]** The Appellee responds that the cap statute cannot warrant FNC dismissal because "such laws are contrary to the United States' public policy in favor of international arbitration." Brief for Appellee at 63.

The parties are similarly at odds with respect to international comity, which is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895); *see JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005). The Appellants point out that a conflict between domestic and foreign law is an important criterion for a comity dismissal, *see Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 798 (1993); *In re Maxwell Communication Corp.*, 93 F.3d 1036, 1047–48 (2d Cir. 1996), and contend that enforcement of the Award in the United States cannot be achieved without disregarding

---

the dispute," or where it is unclear whether the alternative forum will even hear the case. *See id.* at 254 n.22. *El-Fadl* also noted that an alternate forum is inadequate if it does not permit litigation of the subject matter of the dispute, 75 F.3d at 677, and concluded that Jordanian law constituted an "absolute prohibition" to the plaintiff's bringing suit in Jordan, *id.* at 678.

-12-

Peru's cap statute. **[blue 54-55]** The Appellee responds that comity considerations, just like FNC considerations, do not warrant dismissal on the ground of comity in view of the strong United States policy favoring the enforcement of foreign arbitral awards, as made manifest by adherence to the Panama Convention.

We agree with the Appellants that the cap statute is a highly significant public factor warranting FNC dismissal. Although it obviously has special significance for one of the parties in this litigation, Peru, and to that extent differs from public factors such as court congestion, *see Gilbert*, 330 U.S. at 508, which are independent of particular litigants, there is nonetheless a public interest in assuring respect for a sovereign nation's attempt to limit the rate at which its funds are spent to satisfy judgments.[10]

In the somewhat similar context of abstention, the Supreme Court has observed that deferring to litigation in another jurisdiction is appropriate where the litigation is "intimately involved with sovereign prerogative" and it is important to ascertain the meaning of another jurisdiction's statute "from the only tribunal empowered to speak definitively." *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28–29 (1959). The rate at which public funds may be disbursed to satisfy public obligations is surely "intimately involved with sovereign prerogative" and the Peruvian courts are "the only tribunal[s] empowered to speak authoritatively" on the meaning and operation of the cap statute.

---

[10]A public interest of this sort is considerably broader than the colloquial understanding of the word "convenient," which may be one reason why the phrase *forum non conveniens* is best rendered in Latin.

–13–

With the underlying claim arising (1) from a contract executed in Peru (2) by a corporation then claiming to be a Peruvian domiciliary (3) against an entity that appears to be an instrumentality of the Peruvian government, (4) with respect to work to be done in Peru, the public factor of permitting Peru to apply its cap statute to the disbursement of governmental funds to satisfy the Award tips the FNC balance decisively against the exercise of jurisdiction in the United States.

Despite these private and public factors favoring an FNC dismissal, Figueiredo contends that FNC dismissal is not warranted because of the interest of the United States favoring enforcement of arbitration agreements in international contracts, *see Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n. 15 (1974), and the provision of the Panama Convention authorizing enforcement of international arbitration awards. *See* Panama Convention, Art. 4, Jan. 30, 1975, O.A.S.T.S. No. 42. Although enforcement of such awards is normally a favored policy of the United States and is specifically contemplated by the Panama Convention, that general policy must give way to the significant public factor of Peru's cap statute. Moreover, Article 4 of the Convention explicitly provides that execution of international arbitration awards "may be ordered . . . in accordance with the procedural laws of the country where it is to be executed . . . .," and FNC is a doctrine "of procedure," *American Dredging Co. v. Miller,* 510 U.S. 443, 453 (1994). *See Monegasque*, 311 F.3d at 495-96 (making same point with respect to similar wording of the New York Convention, June 10, 1958, 21 U.S.A. 2517, T.I.A.S. No. 6997, 330 U.N.T. 53.)

The District Court also said that Peru should not be able to prevail on the ground of FNC because it entered into the Panama Convention, *see Figueiredo*, 655 F. Supp. 2d at 377, suggesting that Peru thereby assumed the risk that any award against it would be enforced in a signatory country like the United States. However, not only does the Convention contemplate application of a signatory forum's procedural doctrines, as we have pointed out, but, in our view, if comparative risks are to be assessed, Figueiredo took the more significant risk of having collection of an award subject to the cap statute when it entered into a contract with an entity that it contends is an organ of the Peruvian government.

## Conclusion

For all of the reasons stated, we conclude that the petition should be dismissed on the ground of FNC.[11] We direct that the

---

[11]Judge Lynch's well argued dissent merits a brief response. First, he points out that Article V of the Panama Convention "was intended to make[] it clear that once the procedural requirements for enforcement are met no other grounds except those included in [Article V] may be invoked as a defense." Dissenting op. at **[xx]** (internal quotation marks omitted). However, we are not invoking FNC as a "defense." Although the result of an FNC dismissal is undoubtedly a declination to accord a plaintiff the relief sought, such a dismissal is not the assertion of a defense on the merits. It simply denies relief here, leaving a plaintiff free to seek enforcement of an award elsewhere. There has been no refusal to recognize the Award.

Second, he cautions that courts should be wary of using FNC to refer enforcement plaintiffs "back to the very courts they sought to avoid." *Id*. at **[xx]**. Although the parties' contract permitted arbitration and arbitration occurred, what the parties agreed to was "to subject themselves to the competence of the Judges and Courts of the City of Lima or the Arbitration Proceedings, as applicable." Moreover, after the Award was issued, the parties litigated in the Court of Appeals in Lima the issue of whether the arbitration was a "national arbitration" involving only domestic parties, an issue on which Figueiredo prevailed.

-15-

dismissal should be conditioned on the Appellants' consent to suit in

---

Third, he says we have concluded that the three-percent cap "should apply" to enforcement of the Award. *Id*. at **[xx]** (emphasis in original). That overstates our view. As the dissent recognizes, we have disclaimed making any determination as to exactly how the three percent cap operates. Indeed, Figueiredo insists that there are reasons why the cap will not be applied to the payment of whatever judgment it ultimately obtains. We determine only that the existence of a statute designed to protect the rate of payment of funds of a sovereign state is a public interest factor that decisively tips the FNC balance in a case where the parties and the underlying dispute have no connection at all to this country.

Fourth, he contends that Peru is not an adequate forum because Figueiredo "comes to us with the specific and narrow intent of enforcing its arbitration award against Peru's assets in the United States." *Id*. at **[xx]** But Figueiredo's intent to collect the Award out of assets in this country is merely the reason it sued here; it cannot also be the reason why it is entitled to do so, at least when Peru's assets are located in an adequate forum elsewhere.

Fifth, he appears to describe the Court's ruling as if it were a disagreement with the District Court's exercise of discretion in weighing the FNC factors. In fact, we consider the District Court to have committed legal errors both in deeming a Peruvian forum inadequate and in declining to consider the three-percent cap to be a public factor in the FNC balance.

Sixth, he suggests that an FNC dismissal, which might result in having payment of the award subject to the three percent cap if Figueiredo seeks to enforce the Award in Peru, amounts to "sleight of hand," *id*. at **[xx]**, because a statute that does not apply here as a matter of choice of laws would apply in Peru. But there is nothing magical about that consequence, should it occur; it would be a routine consequence of any FNC dismissal. Whenever a suit is dismissed on FNC grounds in country A, where Country B's procedural statute, like a limitation on the rate of payment of a judgment, does not apply, and the suit is refiled in country B, the procedural statute of country B applies. Foreign procedural rules normally do not apply in domestic lawsuits and normally do apply in the forum of the foreign state.

Finally, Judge Lynch points out the absence of authority for the proposition that the three percent cap is a public interest factor in the FNC balance. Since we are aware of no prior litigation in which anyone has asserted that the three percent cap or any similar statute limiting the rate of payment of a sovereign's funds is a public interest factor in the FNC balance, it is not surprising that no court has ruled on the issue--either way. Every issue has to arise somewhere for the first time.

-16-

the courts of Peru, including a waiver of any otherwise applicable statute of limitations,[12] and subject to the further condition that if, for any reason, the courts of Peru decline to entertain a suit to enforce the Award, this lawsuit may be promptly reinstated in the District Court.

Reversed and remanded with directions to dismiss the petition.

---

[12]The Supreme Court has explicitly left open the question of whether a court dismissing on the ground of FNC without ruling on subject matter jurisdiction may condition the dismissal on waiver of jurisdictional and limitations defenses in the foreign forum. *See Sinochem*, 549 U.S. at 435. Until authoritatively advised that this practice is impermissible, we will continue to approve such waivers, *see Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 968 & n.6 (2d Cir. 1980) (remanding FNC dismissal to be conditioned on willingness of foreign court to hear case and consent of defendants to submit to foreign court's jurisdiction); *Schertenleib v. Traum*, 589 F.2d 1156, 1163 (2d Cir. 1978) (FNC dismissal conditioned on consent to jurisdiction in foreign forum); *cf. Bank of Credit and Commerce International (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 247 (2d Cir. 2001) (recommending condition "to deal with the potentially serious problem of congestion and delay in [alternate forum's] courts").

GERARD E. LYNCH, *Circuit Judge*, dissenting.

By acceding to the Inter-American Convention on International Commercial Arbitration ("Panama Convention"), our country has committed itself to open our courts to the enforcement of international arbitral awards as if they were foreign judicial judgments. This commitment requires us to recognize and enforce international arbitral awards in the vast majority of cases. Today, however, the majority concludes that this commitment may be trumped by a Peruvian statute limiting the portion of its annual budget that an entity of the state may pay towards the satisfaction of a lawfully obtained arbitration award. Neither the majority nor any party argues that this foreign statute operates on our soil of its own force. Nor could they; it is well established that, with few exceptions, none of which are relevant here, forum law governs the enforcement of foreign judgments, even when resolution of the underlying dispute turned on the law of another jurisdiction. See Restatement (Second) of Conflict of Laws § 99 (1969) ("The local law of the forum determines the methods by which a judgment of another state is enforced."). Rather, the majority concludes that Peru's three-percent cap on the payment of judgments is a public interest factor – indeed, the dispositive factor – weighing in favor of a forum non conveniens dismissal. Because I question both the applicability of the forum non conveniens doctrine on the facts of this case and the majority's conclusion that the relevant considerations weigh in favor of dismissal, I respectfully dissent.

At the outset, it is important to emphasize that this is simply an action to confirm an award to which the plaintiff is unquestionably entitled. If Figueiredo had sought to adjudicate the underlying merits of its dispute with Peru (or its agency, the "Program") in

an American court, the forum non conveniens doctrine would have obvious bite: neither party has any particular connection to the United States; the locus of the transaction was entirely domestic to Peru; none of the witnesses or documents relevant to resolving the dispute is located here; and the United States has no interest in the dispute, while Peru has a significant interest. But that is emphatically not this case. The adjudication of the merits has already taken place, in the arbitral forum that the parties themselves contractually selected, and the plaintiff has prevailed. What Figueiredo seeks now is simply the right to enforce the award that it has already received from the arbitration panel and that the United States has committed by treaty to honor. Because I believe that we should respect that right and honor that commitment, I respectfully dissent.

I. The Availability of Forum Non Conveniens in Arbitration Enforcement Proceedings Under the Panama Convention

By using the mechanism of forum non conveniens to import a substantive and self-serving provision of Peruvian law into what should properly be a summary proceeding, the majority significantly undermines the background expectations against which the parties made their contract. As the Supreme Court has recognized, "uncertainty will almost inevitably exist with respect to any contract touching two or more countries, each with its own substantive laws and conflict-of-laws rules. A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." Scherk

2

v. Alberto-Culver Co., 417 U.S. 506, 516 (1974).  Increasingly, the forum that is specified in such agreements is international arbitration.  Between 1993 and 2003, the number of international arbitrations overseen by the leading arbitral institutions nearly doubled, and as of 2005 it was estimated that nearly ninety percent of transnational commercial contracts contained an arbitration provision.  See Christopher R. Drahozal, New Experiences of International Arbitration in the United States, 54 Am. J. Comp. L. 233, 233 & n.1 (2006).

Parties that contract across national lines choose to resolve their disputes via arbitration for many reasons.  But no doubt one of the most important – particularly, though not exclusively, where one party is a sovereign – is that they do not necessarily trust the court systems of the relevant countries, and believe that the arbitral forum provides more reliable justice.  See, e.g., H. M. Holtzmann, Arbitration: An Indispensable Aid to Multinational Enterprise, 10 J. Int'l L. & Econ. 337, 337-38 (1975) (noting that "[w]hen disputes arise, the multinational corporation is usually unwilling to go to the courts of the government with whom it is in conflict"); see also Leonard V. Quigley, Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049, 1051 (1961) ("The businessman doing business in several countries has an additional reason for preferring arbitration to local judicial remedies – the fear of discrimination against the foreigner, consciously felt in actual bias or unconsciously exhibited by preference for local principles of law.").

But because arbitrators have no power to enforce their judgments, international arbitration is viable only if the awards issued by arbitrators can be easily reduced to judgment in one country or another and thereby enforced against the assets of the losing party. Until relatively recently, a party that had prevailed in an international arbitration faced significant uncertainty in its efforts to satisfy its award. In some jurisdictions, enforcement required a full trial on the merits of the underlying dispute. See Quigley, supra, at 1051 & n.15. At a minimum, many countries maintained procedures for the enforcement of foreign awards that were substantially more onerous than those that applied to domestic awards. Id.; see also Ernest G. Lorenzen, Commercial Arbitration – Enforcement of Foreign Awards, 45 Yale L.J. 39, 44 (1935) (describing procedures). Efforts to negotiate bilateral enforcement treaties advanced slowly and resulted in a patchwork of differing regimes and substantial uncertainty as to which contracts and awards would be covered where. Quigley, supra, at 1051-54. The so-called Geneva Treaties, concluded in the 1920s under the auspices of the League of Nations, represented an early attempt to achieve a multilateral solution. See Protocol on Arbitration Clauses, Sept. 24, 1923, 27 L.N.T.S. 157; Convention on the Execution of Foreign Arbitral Awards, Sept. 26, 1927, 92 L.N.T.S. 301. These agreements, however, were roundly criticized for, among other things, failing to receive the assent of important states (including the United States), lacking clarity as to the types of arbitrations covered, and placing excessive burdens on the party seeking to compel arbitration. See Paolo Contini, International Commercial Arbitration: The United Nations Convention on the

4

Recognition and Enforcement of Foreign Arbitral Awards, 8 Am. J. Comp. L. 283, 289 (1959). Most importantly for these purposes, "the possibility of contesting the validity of an award on grounds other than those listed in the [Geneva] Convention [was] regarded as making it too easy for a recalcitrant defendant to avoid the enforcement of an award by resorting to obstructionist tactics." Id.

The Panama Convention and its predecessor agreement, the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), were designed to overcome these obstacles. As the Supreme Court has noted, "[a] parochial refusal by the courts of one country to enforce an international arbitration agreement," and *a fortiori* an arbitration award, not only undermines business confidence, but also "invite[s] unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages." Scherk, 417 U.S. at 516-17. This dynamic, in turn, threatens to "damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements." Id. at 517. It was precisely these concerns that motivated the drafters of the New York Convention, at the urging of the International Chamber of Commerce, to craft a document that would carefully circumscribe the bases on which the courts of a signatory nation could disregard an arbitration provision or refuse to enforce an arbitral award. Thus, the committee report that accompanied the initial draft of the treaty emphasized that the inclusion of the word "only" in what is now Article V was intended to "make[] it clear" that once the procedural requirements for enforcement are met "no other grounds

5

except those included in this article may be invoked as a defense."[1]  U.N. Econ. & Soc. Council, Report of the Committee on the Enforcement of International Arbitration Awards 9, U.N. Doc. E/2704 (Mar. 28, 1055), available at http://www.uncitral.org/pdf/english/travaux/arbitration/NY-conv/e-ac/eac424r1-N5508097.pdf.  Like the New York Convention on which it was modeled, the Panama Convention clearly and emphatically limits the grounds on which a signatory state may refuse to recognize an arbitration award.  Under Article V of the treaty, "[t]he recognition and execution of the decision may be refused, at the request of the party against which it is made, *only* if such party is able to prove" the existence of certain carefully specified defenses.  Panama Convention art. V, opened for signature Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245 (emphasis added).

It is beyond question that the Peruvian statute limiting the amount that government agencies can be compelled to pay on judgments against them is not, of its own force, a basis for an American court to refuse to enforce an arbitration award against a Peruvian governmental entity, and the majority does not suggest otherwise.  Rather, it declines to enforce the award on the ground of forum non conveniens, though – as discussed below – it then distorts that doctrine by making its application turn entirely on that very provision

_____

[1] In its current form, Article V of the New York Convention provides that "[r]ecognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, *only* if that party furnishes to the competent authority where the recognition and enforcement is sought, proof" of one of seven specifically enumerated defects.  New York Convention art. V, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (emphasis added).

6

of Peruvian law.

Given that forum non conveniens is not listed as a defense to enforcement in either the New York or the Panama Convention, a strong case can be made that, by acceding to the treaties, the United States has made the doctrine inapplicable to enforcement proceedings that they govern. Moreover, because forum non conveniens is a discretionary doctrine that resists attempts "to catalogue the circumstances which will justify or require either grant or denial of [the] remedy," Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947), superseded on other grounds by 20 U.S.C. § 1404, its application in these circumstances would seem to dramatically undercut the treaty drafters' efforts to foster confidence in the reliability and efficacy of international arbitration. For these reasons, the Ninth Circuit has rejected the application of forum non conveniens in the related context of actions governed by the Warsaw Convention,[2] noting that the treaty's purpose of achieving predictability and uniformity of results would be undermined by a doctrine "that itself is 'vague and discretionary,' and that 'is most unlikely to produce uniform results.'" Hoska v. United Airlines, Inc., 305 F.3d 989, 997 (9th Cir. 2002), quoting United States v. Nat'l City Lines, 334 U.S. 573, 581 (1948) and Am. Dredging Co. v. Miller, 510 U.S. 443, 453 (1994).

---

[2] The Convention for the Unification of Certain Rules Relating to International Transportation by Air or "Warsaw Convention" is "a multilateral treaty that regulates, *inter alia*, liability for international air carriers." Avero Belgium Ins. v. American Airlines, Inc., 423 F.3d 73, 75 n.2 (2d Cir. 2005); see Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. 11.

Applying forum non conveniens to enforcement actions is inconsistent with the New York and Panama Conventions in another way as well. In addition to limiting states' discretion to deny enforcement in individual cases, the treaties seek "to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." Scherk, 417 U.S. at 520 n.15. Forum non conveniens, however, is unknown in civil law countries. See Ronald Brand, Comparative *Forum Non Conveniens* and the Hague Covention on Jurisdiction and Judgments, 37 Tex. Int'l L.J. 467, 468 (2002). Consequently, applying the doctrine to enforcement actions in the United States – particularly in the expansive manner that the majority employs it here – introduces a highly significant inconsistency into the international regime of reciprocal enforcement that is unlikely to have been anticipated by the treaties' drafters and signatories at the time the treaties were concluded. Indeed, broad application of forum non conveniens would seem to dramatically undermine this country's obligations under the treaties to grant enforcement in most cases, since by definition many if not most of the disputes subject to international arbitration involve foreign parties engaged in disputes whose center of gravity is outside of the United States.

That is not only my analysis; it is also the position taken by the draft Restatement (Third) of the U.S. Law of International Commercial Arbitration (Council Draft No. 2, Sept. 27, 2010). Section 5-21(a) of the Restatement flatly states that "[a]n action to enforce a [New York or Panama] Convention award is not subject to a stay or dismissal on forum non conveniens grounds." The accompanying Reporters' Note explains that

8

> [c]onsidering that the Convention grounds for nonrecognition and nonenforcement are meant to be exclusive, it would be incompatible with Convention obligations for a court of a Contracting State to employ inconvenience as an additional basis for dismissing an action for enforcement of an award that is otherwise entitled, as a matter of treaty obligation, to enforcement.

Id., Reporters' Note (a), at 245.[3]

The majority nevertheless concludes that forum non conveniens is applicable to this case, because it is a "procedural law," compliance with which may act as a bar to the enforcement of an arbitral award, even where none of the enforcement limitations explicitly set out in Article V applies. See Panama Convention art. IV (noting that an arbitral decision's "execution or recognition may be ordered in the same manner as that of decisions handed down by national or foreign ordinary courts, *in accordance with the procedural laws of the country where it is to be executed*") (emphasis added). In so concluding, the majority is on firm precedential ground in this Circuit. In In re Arbitration Between Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine ("Monegasque"),[4] our Court concluded that a similar provision in the New York

---

[3] This draft of the Restatement achieved final approval by the Council of the American Law Institute ("ALI") in December 2010 and thus constitutes the most current iteration of the Institute's official position. At any rate, I here seek to invoke not so much the prestige of the ALI as the cogency of the analysis set forth by the Reporters in support of their position.

[4] The government's brief and some of the secondary literature refer to the case as "Monde Re," the short name that Monegasque used for itself during the litigation in our Court. See generally Monegasque, 311 F.3d 488 (referring to the company as "Monde

Convention requiring enforcement "in accordance with the rules of procedure" of the forum permitted the district court to dismiss an enforcement action on forum non conveniens grounds. See 311 F.3d 488, 495-97 (2d Cir. 2002).

I recognize that Monegasque is a binding precedent of this Court and that, although interpreting a different treaty, it fairly implies that forum non conveniens will be an available ground for declining to recognize an arbitration award under the Panama Convention. I note, however, that there are substantial reasons to think that Monegasque was wrongly decided. In addition to the considerations expressed above, which are rooted in the purposes of the treaties and the interests of the contracting parties, I question whether the treaties' references to "procedural laws" and "rules of procedure" can bear the weight that the Monegasque court and, today, the majority put on them. Though it is true that the Supreme Court has labeled forum non conveniens a "doctrine . . . of procedure" for federal preemption purposes, see Am. Dredging Co., 510 U.S. at 453, there is little reason to think that the drafters of the treaties, who were drawn from a variety of legal traditions, considered what impact this rather technical and distinctly American use of the term might have on the enforceability of international arbitration awards.

The Monegasque court supported its interpretation of the treaty by noting that the drafters of the New York Convention had considered and rejected a proposal to adopt a

Re").

10

procedure for enforcement that would be uniform across all of the signatory states. Yet, examined in context, the source upon which the court relied makes clear that the procedural variations envisioned were of a much more technical nature and pertained chiefly to whether a signatory country could treat international awards differently from domestic ones. See Quigley, supra, at 1065 (citing as one such procedural idiosyncrasy the fact that El Salvador and Sweden require foreign awards to "be submitted to the Court for a determination whether the requirements of relevant international instruments had been satisfied, while domestic awards are granted summary execution"). Indeed, prior to Monegasque, "most observers considered that [the 'procedure'] provision related to the *form* of enforcement, not the *conditions* for enforcement." William W. Park, Respecting the New York Convention, 18 ICC Int'l Ct. of Arb. Bull. 65, 70 (2007). In other words, the "procedure" provisions of the treaties permit variation with regard to the manner in which signatory states enforce international arbitration awards; they do not provide a means by which a state may decline to enforce such awards at all.

Based on these observations and others, a number of commentators have argued that our decision in Monegasque places the United States in breach of its treaty obligations under the New York (and now Panama) Convention. See, e.g., William W. Park & Alexander A. Yanos, Treaty Obligations and National Law: Emerging Conflicts in International Arbitration, 58 Hastings L.J. 251, 255-56 (2006); Int'l Commercial Disputes Comm., Ass'n of the Bar of N.Y.C., Lack of Jurisdiction and Forum Non

11

Conveniens as a Defense to the Enforcement of Foreign Arbitral Awards, 15 Am. Rev. Int'l Arb. 407, 428  (2004); Pelagia Ivanova, Note, *Forum Non Conveniens and Personal Jurisdiction: Procedural Limitations on the Enforcement of Foreign Arbitral Awards Under the New York Convention*, 83 B.U. L. Rev. 899, 907-11, 920 (2003).

For these reasons, if I were free to consider this issue as one of first impression, I would be inclined to conclude, contrary to <u>Monegasque</u>, that the doctrine of forum non conveniens is not available at all in an action such as this one.  While I am not free to reconsider the holding of <u>Monegasque</u>, perhaps these observations will be of use in persuading other courts that are not bound by its authority to give further thought to this issue.

## II.  The Application of Forum Non Conveniens to the Present Case

Even accepting, as I am bound by precedent to do, that forum non conveniens may be asserted as a ground for refusing to enforce an arbitral award under the Panama Convention, I am persuaded that the majority misapplies the doctrine in this case.  First, the considerations that militate against applying the doctrine at all also counsel against invoking it to dismiss an enforcement action governed by the Convention in all but the most exceptional of cases.  Second, even giving no weight whatsoever to the considerations that powerfully suggest particular restraint in applying the doctrine in this context, the majority's view seems to me an incorrect application of the doctrine under established law.  Before addressing these issues, however, it is important to point out that

the present case is clearly distinguishable from <u>Monegasque</u>, the only previous case in which we have found that forum non conveniens supported dismissal of an action to enforce an arbitral award. Several factors that weighed heavily in favor of dismissal in <u>Monegasque</u> are absent from this case.

First, and perhaps most importantly, <u>Monegasque</u> *affirmed* a district court's dismissal on the basis of forum non conveniens, while here the majority *reverses* the district court's decision to entertain an action over which it undisputedly had jurisdiction. It is well established that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." <u>Colo. River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 817 (1976). The forum non conveniens doctrine represents a narrow exception to this rule rooted in "the inherent power of the courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." <u>Monegasque</u>, 311 F.3d at 497 (internal quotation marks omitted). Because it is primarily a doctrine of case management, we have emphasized that the district court's decision on a motion to dismiss for forum non conveniens is entitled to considerable deference. In <u>Iragorri v. United Technologies Corp.</u>, this Court, sitting en banc, stated in a unanimous opinion:

> The decision to dismiss a case on *forum non conveniens* grounds lies wholly within the broad discretion of the district court and may be overturned only when we believe that discretion has been *clearly abused*. In other words, our limited review encompasses the right to determine whether the district court reached an erroneous conclusion on either

13

> the facts or the law, or relied on an incorrect rule of law in reaching its determination. Accordingly, we do not, on appeal, undertake our own *de novo* review, simply substituting our view of the matter for that of the district court.

274 F.3d 65, 72 (2d Cir. 2001) (ellipses, brackets, and internal citations omitted) (emphasis in the original).

In light of the broad discretion of the district court in these matters and the general obligation of federal courts to accept the jurisdiction that Congress gives them, it is unsurprising that, although this Court has reversed a district court's decision to *grant* a motion to dismiss on the basis of forum non conveniens in ten prior cases, I have not identified even a single case in which we have found fault with a district court that *denied* such a motion. This case therefore represents a first for our Court, a fact that should give the majority pause.

Monegasque is distinguishable from this case in other respects as well. The Monegasque court emphasized at length the legal and factual difficulties that were presented by the plaintiff's efforts to impute the primary defendant's contractual liability to its sovereign parent, the Ukraine. The court emphasized that the case "[did] not lend itself to summary disposition," because "extensive discovery" and a trial would likely be required to properly adjudicate the plaintiff's claim of non-signer liability. 311 F.3d at 500. Given that the relevant witnesses and documents were located in the Ukraine, the court concluded that these complications were important private interest factors weighing

14

heavily in favor of dismissal.  Id.  Although Peru argues that similar considerations

counsel dismissal in this case, the district court, after carefully considering the issue,

concluded that "whether the Award can be confirmed against the Republic is a question

that can be, and has been, decided by this Court without extensive discovery."  Figueiredo

Ferraz Consultoria e Engenharia de Projeto Ltda. v. Republic of Peru, 655 F. Supp. 2d

361, 376 (S.D.N.Y. 2009).  The district court thus found that, unlike the situation in

Monegasque, the issues presented by this case did not require extensive and complex

proceedings that would more easily be held in some other forum.

The majority finds no fault with that analysis, and offers no suggestion that the

district court erred, as a matter of fact or law, in holding that this case, unlike

Monegasque, can be resolved in the Southern District of New York without undue

inconvenience to either party or to the court.[5]  Rather, the majority rests its decision on

the argument that "the three percent cap is a highly significant public factor" that itself

justifies overturning the district court.  Majority Op., ante at **[15]**.  But the majority's

position – that a substantive law that is favorable to one of the parties is a public interest

factor that may count in the forum non conveniens balance if that party is also a sovereign

– finds no support in Monegasque or any other case of which I am aware.  To the

_____

[5] If we were to conclude that the district court properly declined to dismiss the
case, we would be required to determine whether it erred in concluding that the
Program's liability on the arbitration award could be imputed to the Republic.  Because
the majority's resolution of the case does not require it to reach this question, I express no
view on the merits of it.

15

contrary, the Supreme Court has specifically held that whether the alternative forum's substantive law is more or less favorable to the party seeking dismissal is *not* a factor that the district court may consider in deciding a forum non conveniens motion.  See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 247-49 (1981).  And, indeed, the court in Monegasque made clear that its decision was not premised on any concern that U.S. law was less favorable to the sovereign defendants than Ukranian law by pointing out that "Ukrainian law specifically provides for the execution of judgments against government properties," apparently without limitation.  311 F.3d at 499.  Thus, although Monegasque precludes a holding that forum non conveniens is simply inapplicable to this case, it does not dictate the result that the majority reaches today.

Moreover, nothing in Monegasque is inconsistent with the view that courts must be cautious in applying forum non conveniens in the context of actions to enforce arbitration awards under the New York and Panama Conventions, and must not be misled into assuming that dismissal is required simply because the underlying dispute has little or no nexus to the United States.  Such caution is amply warranted in light of the text and the history of the Conventions as well as the need to ensure the dependability and impartiality of international arbitration so as to promote transnational commerce.  See Scherk, 417 U.S. at 517.  The entire point of the Conventions is to "assure transacting businesses that arbitration clauses and arbitral awards will be enforced, and that rules of procedural fairness will be observed."  H.R. Rep. No. 101-501, at 5 (1990) (advocating

16

implementation of the Panama Convention).  The value of international arbitration, especially in contracts involving sovereign states, is that it provides a mechanism by which commercial actors may avoid the "home court advantage" of proceeding in the courts of an adversary state.  But this advantage is negated if a party may obtain an independent adjudication on the merits, but is prevented from enforcing any award it obtains anywhere but in the courts of the very country that is to pay the award.  The Convention seeks to open the doors of foreign courts to efforts to enforce arbitration awards wherever assets are available, free of local prejudice or obstructive local rules that make enforcement difficult in the courts of the adversary state.

Accordingly, even on the assumption that in some circumstances a court in a signatory state may invoke forum non conveniens in declining to entertain an enforcement action, we should be especially wary of applying that doctrine expansively or in novel ways that suggest that enforcement plaintiffs should be referred back to the very courts they sought to avoid in resorting to arbitration.[6]

Yet even apart from the special considerations dictated by the Panama Convention, I cannot conclude, based on a standard application of the forum non conveniens doctrine, that the district court abused its discretion in declining to dismiss this case.  Dismissal on

---

[6] The majority notes that the contract between the parties did not completely foreclose resort to the Peruvian courts.  Majority Op., ante at **[17 n.12]**  True, but hardly relevant.  Figueiredo bargained for and received the right to resort to arbitration and chose to exercise that right, thus channeling this dispute to an arbitration panel in preference to the courts of Peru.

17

the basis of forum non conveniens is permissible only "when trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or when the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems." Piper, 454 U.S. at 241 (internal quotation marks and ellipses omitted). The somewhat unusual facts of Monegasque notwithstanding, it will seldom be the case that these conditions are satisfied in a suit to enforce an international arbitration award.[7]

Again, the essentially summary nature of enforcement proceedings matters. Forum non conveniens is intended to minimize practical problems so as to "make *trial* of a case easy, expeditious and inexpensive." Gulf Oil, 330 U.S. at 508 (emphasis added). But in a summary proceeding to confirm an arbitration award, "the proof and logistics factors attendant to trial are non-existent." Melton v. Oy Nautor Ab, No. 97-15395, 1998 WL 613798, at *2 (9th Cir. Aug. 10, 1998) (Tashima, *J.*, dissenting). In this case, for example, there was only one substantive issue before the district court, a pure question of law as to whether the Program was an organ of the Peruvian state rather than a state "instrumentality" having an independent existence. The district court did not find that a

---

[7] The draft Restatement supports that view as well: in recognizing the possibility of forum non conveniens dismissals in suits to enforce international arbitration awards that are *not* subject to the Conventions, the Restatement takes the position that even in that context, forum non conveniens motions should "rarely be granted." Restatement (Third) of the U.S. Law of International Commercial Arbitration (Council Draft No. 2, Sept. 27, 2010) § 5-21(b), Reporters' Note (b), at 246.

18

particularly difficult issue or one that was more expensive or difficult to litigate in the United States than in Peru, and the majority does not suggest that it disagrees. As a sovereign state with substantial resources and with significant commercial interests in the United States, Peru (unlike some private parties) was amply able to litigate those questions here. I therefore fail to see how allowing this proceeding to go forward in this country would "establish oppressiveness and vexation" to Peru as a litigant. Nor does this case present obvious "administrative and legal problems" for the district court. The United States District Court for the Southern District of New York is a very busy court, but one more case – particularly one as summary and simple as this one – will hardly tax its capacities. Indeed, the district court (which is far better positioned than we are to make the determination) seems to have concluded as much in declining to dismiss the case on forum non conveniens grounds.

Nonetheless, the Court holds today, apparently for the first time in its history, that the district court's decision to retain jurisdiction over the case "cannot be located within the range of permissible decisions," Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir. 2001). It reaches this result by way of logic that is unprecedented and, I believe, specifically foreclosed by controlling Supreme Court law. Despite recognizing (as do the parties) that Peru's three-percent judgment cap does not apply here as a matter of choice of law, the majority nevertheless concludes that the cap *should* apply to this proceeding and that its inapplicability here renders the United States an inconvenient forum. As a

result, the plaintiff is left to seek its remedy in the Peruvian courts – the very forum it entered arbitration to avoid – where the cap undisputedly will apply. The majority is aware of course that, under Piper v. Reyno, "[t]he possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry." 454 U.S. at 247. It therefore achieves this result by a sleight of hand: asserting that although, in the normal course, forum non conveniens is self-consciously blind to how dismissal will affect the substantive law that governs the case, when one of the parties is a sovereign, substantive legal issues may be transformed into public interest factors and considered in the analysis.

This position finds no support in Piper, Monegasque, or any other judicial precedent of which I am aware. The absence of authority is unsurprising. As is clear from its very name (whether rendered in Latin or English),[8] the doctrine of forum non conveniens is properly a neutral procedural rule that selects a forum based on convenience, not a device for steering parties to the forum that is likely to apply the substantive law that one or the other of them favors (or that judges in the forum court think is desirable).

---

[8] At the risk of seeming not to appreciate the wry humor of the Court's footnote, see Majority Op., ante at **[15 n.10]**, I would point out that denominating a doctrine in Latin should not obscure its meaning: forum non conveniens means "inconvenient forum," pure and simple. And, as discussed below, whether the title is stated in Latin or in English, the questions asked under the doctrine are indeed those suggested by the name.

20

Focusing on the factors that the Supreme Court *has* said that courts may consider as part of the forum non conveniens analysis makes it clear both that this is so and that the district court did not abuse its discretion in declining to dismiss this case. In considering whether dismissal on forum non conveniens grounds is appropriate, a district court first "determines the degree of deference properly accorded the plaintiff's choice of forum"; second, "it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute"; and finally, it "balances the private and public interests implicated in the choice of forum." Norex Petroleum Ltd. v. Access Indus., 416 F.3d 146, 153 (2d Cir. 2005).

At the first step, we must always start with "a strong presumption in favor of the plaintiff's choice of forum," Piper, 454 U.S. at 255, but the ease with which this presumption may be overcome will vary depending on the particular facts of each case. The ultimate inquiry is whether "considerations of convenience" motivated the plaintiff's choice of a U.S. forum or whether, instead, that choice "was motivated by forum-shopping reasons." Iragorri, 274 F.3d at 72. Although, as a general matter, "when a foreign plaintiff chooses a U.S. forum, it is much less reasonable to presume that the choice was made for convenience," id. at 71 (internal quotation marks omitted), "[i]t is not a correct understanding of the rule to accord deference only when the suit is brought in the plaintiff's home district," id. at 73. "Rather, the court must consider a plaintiff's likely motivations in light of all the relevant indications." Id. "[T]he greater the

21

plaintiff's *or the lawsuit's* bona fide connection to the United States and to the forum of choice . . . , the more difficult it will be for the defendants to gain dismissal for *forum non conveniens*." Id. at 72 (footnote omitted, emphasis added).

Both the district court and the majority assign reduced deference to Figueiredo's choice of forum due to the fact that it is a foreign plaintiff, but I question whether that determination is correct in light of the intimate connection between the Southern District of New York and *this lawsuit* – which is concerned exclusively with the plaintiff's ability to enforce its award against U.S.-based assets of the defendant. Monegasque does not suggest otherwise. It is true that in that case – which, like this one, was an action to enforce an arbitral award – we said that the foreign plaintiff's choice of forum was entitled to "little deference." 311 F.3d at 499. But in so concluding, we emphasized that Monegasque's motivation in bringing its enforcement proceeding in the United States was "not apparent," and that "the jurisdiction provided by the [New York] Convention [was] the only link between the parties and the United States." Id. Here, in contrast, Figueiredo has identified specific assets in the United States against which it hopes to levy, thereby making the nexus between this action and the United States very tight indeed.[9]

_____

[9] Although the majority plumbs the record in Monegasque in an effort to support its assertion that the plaintiffs in that case likewise sought to collect against specific U.S.-based assets, it ultimately can muster nothing more than speculation based on a statement in the district court's opinion that is at best ambiguous. See Majority Op., ante at **[12 n.8]**. Even if the majority were correct, however, that the Monegasque plaintiffs

22

Nor is this consideration canceled, in my view, by the defendants' accusation that, in seeking enforcement here, "Figueiredo is engaged in blatant forum shopping" of the sort that in Iragorri we found to counsel against deference to the plaintiff's choice of forum. See Iragorri, 274 F.3d at 72. I understand the argument that the desire to enforce the award against assets in a jurisdiction that is unlikely to apply Peru's judgment cap might be considered seeking a "tactical advantage resulting from local laws that favor the plaintiff's case," id. But the Supreme Court has stated that the consideration of where a judgment may be most enforceable is a legitimate criterion for a plaintiff to consider in choosing a forum. See Gulf Oil, 330 U.S. at 508. In light of that principle, I cannot agree that the plaintiff's choice of a U.S. forum was motivated by illegitimate considerations. That a party hopes to secure expedient and full enforcement of a judgment or arbitration award by litigating in a forum with favorable rules for such enforcement does not render its choice of forum illegitimate. Rather, it is improper for a party to choose a forum that presents logistical obstacles for its adversary, making a fair adjudication more difficult – where the plaintiff is motivated by the "pursuit not simply of justice but of justice blended with some harassment," Norex, 416 F.3d at 155 (internal quotation marks omitted). There is no indication in this case that Figueiredo is so motivated or that its choice of

sought to collect against identified assets, that would not establish that the parties actually litigated whether the presence of those assets supported a presumption in favor of a U.S.-forum and whether their absence from the Ukraine rendered that forum an inadequate alternative. Indeed, the cursory discussion of this issue in our opinion, see Monegasque, 311 F.3d at 497, suggests that they did not.

forum in fact presents such difficulty to Peru as a litigant.

In any case, the majority does not challenge the district court's ultimate conclusion that the plaintiff's choice of forum was entitled to at least some deference. And even if the Court were to conclude that that choice is entitled to no deference at all, this factor would merely be neutral and would not tip in favor of dismissing the case.

The second step in the forum non conveniens analysis is to assess the adequacy of the alternative forum. This issue too is affected by a proper understanding of the summary nature of arbitration enforcement proceedings. The D.C. Circuit has ruled that where a plaintiff seeks to confirm an arbitral award against U.S. assets, and those assets can be reached only via a U.S. court judgment (which is the case when dealing with foreign sovereigns), then an alternative forum elsewhere is inadequate. See TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 303-04 (D.C. Cir. 2005). The majority rejects this argument on the ground that, if it were correct, "every suit having the ultimate objective of executing upon assets located in this country could never be dismissed because of [forum non conveniens]." Majority Op., ante at **[11]**. That need not necessarily be so. If this were a case in which liability on the merits had yet to be established, Figueiredo's "ultimate objective" in having any prospective award enforced in the United States would be vague and contingent. The weight of such an action would be concentrated on the yet-to-be-decided issues of underlying liability, and it therefore might be reasonable to conclude that Peru is a perfectly adequate alternative forum in

24

which to resolve *that* issue.

But that is not this case. The merits of the underlying dispute have already been decided, and Figueiredo comes to us with the specific and narrow intent of enforcing its arbitration award against Peru's assets in the United States, as it is entitled to do under the Panama Convention. The resolution of *that* issue is not amenable to jurisdiction elsewhere.[10] I therefore agree with the district court's conclusion that Peru is not an adequate alternative forum.[11]

---

[10] Although the majority suggests that <u>Monegasque</u> held otherwise, I question whether the issue was presented to the <u>Monegasque</u> court in this form. Our opinion discusses and rejects two specific objections to the Ukraine's adequacy as an alternative forum: "the general corruption in the body politic of that nation," 311 F.3d at 499, and the "contention that a Ukrainian forum [was] not an adequate forum simply because a state-owned enterprise of Ukraine [was] involved" in the litigation, <u>id</u>. There is no indication at all that Monegasque made the argument that Figueiredo does here – that the inability of courts other than our own to attach specific assets held in the United States renders any alternative forum inadequate. Indeed, as noted above, note 4, the <u>Monegasque</u> court's assertions that Monegasque's motivation for choosing a U.S. forum was "not apparent" and that its only connection to the United States was "the jurisdiction provided by the [New York] Convention," <u>id</u>., strongly suggest that this argument was not presented.

[11] The majority's position seems to suggest that *only* Peru is an appropriate forum, since only in Peru is it certain that the three-percent cap will be applied. But, of course, the only issue in a forum non conveniens determination is whether *this* forum is inappropriate. Nothing in the Court's judgment prevents Figueiredo from seeking enforcement of its award in another state that is a signatory to the Panama or New York Convention in which Peru has sufficient assets to satisfy the judgment. Such a jurisdiction, if one exists, may not recognize the doctrine of forum non conveniens at all, or may find application of such a doctrine inconsistent with the Conventions. It may well be, therefore, that Figueiredo has a number of alternative fora that may, in a certain sense, be adequate fora in which to achieve its goal.

Moreover, the majority opinion does not address whether Figueiredo could reduce its arbitration award to a judicial judgment in the courts of another signatory country and

In any event, the existence of an adequate alternative forum, like the degree of deference accorded to the plaintiff's choice of forum, is simply a preliminary inquiry. Even assuming arguendo that the plaintiff's choice of forum is entitled to little deference, and that there is an adequate alternative forum in which execution *could* be sought, to achieve a forum non conveniens dismissal a defendant must still show that the balance of the private and public convenience factors tips "*strongly*" in favor of the alternative forum. PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 74 (2d Cir. 1998) (emphasis added). Although Peru argues strenuously that proof issues surrounding Figueiredo's claim of non-signer liability constitute a private convenience factor weighing in favor of dismissal, as noted above, I do not understand the majority to offer any credence to this argument.

Rather, the majority's holding is premised on the view that Peru's desire to enforce the three-percent limit on judgments against the state is a "public interest factor" that

---

then return to the United States to attach Peruvian assets. Since the Conventions equate the enforcement of international arbitral awards with the enforcement of foreign judicial judgments, see Panama Convention art. 4 ("An arbitral decision or award that is not appealable under the applicable law or procedural rules shall have the force of a final judicial judgment."), the majority's analysis would seem to suggest that American courts would find it equally "inconvenient" for a party to seek enforcement of a foreign judicial judgment against the U.S. assets of a foreign government entity wherever the foreign state's laws would limit the equivalent remedy in the courts of that country. I find it difficult to believe, however that this Court would countenance – let alone require – the dismissal of an action to enforce a foreign court's judgment against a judgment debtor's U.S. assets on the ground that it would be more "convenient" for the judgment creditor to bring an action in a foreign court *because* the judgment debtor is a state agency that would be more able to limit enforcement there under domestic law.

26

bears on the forum non conveniens analysis. The Court cites no authority for this

position, because there is none. Indeed, the law tilts decidedly the other way. Consider

what the Supreme Court has said about the relevant public factors bearing on a forum non

conveniens decision:

> Factors of public interest also have place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

Gulf Oil, at 330 U.S. at 508-09.

Some of the cited factors favor enforcement of this award in Peru, albeit weakly.

Certainly, however, they do not – either individually or collectively – tilt strongly enough

in favor of a Peruvian forum to overcome the preference for the plaintiff's choice of

forum. As noted above, the U.S. courts are congested, but the disposition of this

essentially summary proceeding would not be complicated, the case presents no serious

choice-of-law issue, the persons whose affairs it touches are all parties to the litigation,

and no jury trial would be required. Unquestionably, there is a "local interest in having

27

localized controversies decided at home," but that is considerably counterbalanced by the fact that this is an *international* dispute in which the parties consciously consented to litigate in a private arbitration, with the resulting award subject to enforcement in the courts of any state signatory to the Panama Convention.

But however these factors cut, none of them is remotely analogous to Peru's interest in enforcing its three-percent limitation. The public factors cited by the Supreme Court, like the private interest factors, relate to the balance of conveniences – that is, to neutral reasons why it makes sense to hold a judicial proceeding in one country rather than another. The majority correctly appreciates that the plaintiff's desire to obtain a *larger* recovery is not a reason to *reject* application of forum non conveniens. Why then should the defendants' desire to avoid payment by forcing the case into a forum in which the plaintiff's recovery will be *smaller* be a reason to *embrace* it? The hopes of one party to the litigation that it will more easily prevail in the litigation are not transformed into "public factors" simply because that party is a sovereign state.

I recognize that there is something appealing about the argument that Figueiredo should not be able to levy on Peruvian assets in the United States to enforce a large judgment, and thereby escape Peruvian judgment-enforcement limitations designed to protect the budget of a developing country. But that concern is not one that sounds in the interests assessed by a forum non conveniens ruling. In other contexts, such policy considerations might figure in a choice-of-law analysis: Is Peru's interest in the

28

controversy so great that we must respect the three-percent limitation as one that somehow is implicitly incorporated within the arbitration award?  Peru, however, has not argued that its rule should be applied here as a matter of choice of law, and it candidly admitted at oral argument, and in its supplemental post-argument briefing to the Court, that it did not do so because it expected that under ordinary choice-of-law principles the enforcement of the award would be governed by U.S. law.  The majority does not challenge that view, and I have no reason to doubt it.  The Conventions seek to analogize international arbitration awards to foreign judicial judgments, and it is well established that forum law governs foreign judgment enforcement.  <u>See</u> Restatement (Second) of Conflict of Laws § 99 (1969) ("The local law of the forum determines the methods by which a judgment of another state is enforced."); <u>Competex, S.A. v. Labow</u>, 783 F.2d 333, 341 (2d Cir. 1986) (applying New York law to determine whether a judgment obtained in England but enforced in New York has been satisfied); <u>cf</u>. <u>Baker ex rel. Thomas v. Gen. Motors Corp.</u>, 522 U.S. 222, 235 (1998) ("Enforcement measures do not travel with the sister state judgment as preclusive effects do; such measures remain subject to the evenhanded control of forum law.").

If anything, the majority's underlying policy argument presents the issue of whether abstention is required in the interest of international comity.  Yet the State Department tells us that Peru's failure to identify a "true conflict" between its judgment cap and U.S. law governing the enforcement of arbitral awards takes comity

29

considerations off the table, see Hartford Fire Ins. Co. v. California, 509 U.S. 764, 798-99 (1993), and I do not read the majority to disagree. Moreover, to the extent that the public factors do embrace state-level policy concerns, the government makes a compelling case that the interest of the United States in satisfying its obligations under the Panama Convention is at least as great as any interest Peru might have in imposing its limit on the payment of arbitral awards. As the government's brief points out, the United States has a longstanding commitment to promoting international commercial arbitration, as evidenced by the Federal Arbitration Act and Congress's ratification of both the New York and Panama Conventions. That commitment requires our courts to recognize and enforce international arbitral awards in the vast majority of cases.

The majority disregards all of these arguments and, notwithstanding its candid admission that it does not understand precisely how the Peruvian judgment cap operates, see Majority Op., ante at **[4 n.3]**, concludes that the plaintiff's award must be subject to it. Of course, given that we lack power to transfer the case to Peru or to insist that the award be enforced there, the plaintiff remains free to seek enforcement in any of the other countries that are party to the Panama Convention, some of which would no doubt see the cap as no obstacle to recovery. My concern is therefore less with the implications of the majority's holding for this particular plaintiff than with how this decision will distort the law of forum non conveniens in this Circuit and undercut the transnational effort (in which the United States is an active participant) to promote commercial arbitration.

30

Because I believe that the majority's decision adopts an incorrect, expansive, and unprecedented approach to forum non conveniens precisely in a context in which we should be particularly cautious and restrained in its application, I respectfully dissent.